(70 South. 531)

No. 20232.

WALL v. RABITO.

(Nov. 3, 1913. On the Merits, Nov. 29, 1915. Rehearing Denied Jan. 10, 1916.)

*(Syllabus by Editorial Staff.)*

On Motion to Dismiss Appeal.

1. APPEAL AND ERROR ☞801—MOTION TO DISMISS—DISPOSITION.

Where appellee prayed the appeal be dismissed or that the omitted evidence be sent up on allegations that appellant had not produced a complete transcript of the evidence below, and, after the motion to dismiss was filed, appellant applied for certiorari to correct the record, and the clerk below made his return supplementing the transcript and certifying that the record then contained all the evidence which was filed in the case, reciting however, that some offerings by appellee, made by reference, were not included in the transcript because copies were not furnished or the originals filed, the motion to dismiss will be referred to the merits, with leave to the parties to supplement the tran-

script by the production of all documents offered below, as shown by the notes of evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3161–3164; Dec. Dig. ☞801.]

On the Merits.

2. TAXATION ☞679—SALE BY STATE—OBJECTIONS.

Defendant in a petitory action was without standing to raise the question that in making the transfer from the state, under which the plaintiff claimed, to the plaintiff, the forms of law were not complied with, since the state alone had an interest in the matter.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1361, 1362; Dec. Dig. ☞679.]

3. REAL ACTIONS ☞7 — PETITORY ACTION — TITLE.

As against a trespasser a plaintiff in a petitory action need not show a title good against the whole world.

[Ed. Note.—For other cases, see Real Actions, Cent. Dig. §§ 21–25; Dec. Dig. ☞7.]

4. TAXATION ☞679—SALE BY STATE—OBJECTIONS—STANDING TO RAISE.

In a petitory action by a plaintiff claiming under the state against a defendant who had title by adverse possession, defendant was without standing to raise the question that the transfer from the state to plaintiff was invalid because the forms of law were not complied with, since such transfer as to defendant, was res inter alios acta.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1361, 1362; Dec. Dig. ☞679.]

5. ADVERSE POSSESSION ☞4—PRESCRIPTION—RUNNING AGAINST STATE.

Prescription acquirendi causa does not run against the state.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 7–10, 12–57; Dec. Dig. ☞4.]

6. ESTOPPEL ☞15—DEEDS.

Whatever title the state acquired through forfeiture of realty passed to the state's grantee, though not mentioned in the state's deed, as a vendor cannot set up against his vendee any title which he held at the time of the sale.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 19–21; Dec. Dig. ☞15.]

7. REAL ACTIONS ☞8—PETITORY ACTION—RELIANCE UPON TITLE NOT SPECIALLY PLEADED.

In a petitory action, where plaintiff, claiming under the state, deraigned his title only through tax sales and failed to mention forfeitures to the state, such forfeitures could nevertheless be considered as forming part of plaintiff's chain of title, since plaintiff could

support his allegation of ownership by any supporting evidence.

[Ed. Note.—For other cases, see Real Actions, Cent. Dig. §§ 26–35; Dec. Dig. ☞8.]

**8. APPEAL AND ERROR ☞837—REVIEW—EVIDENCE.**

In a petitory action, where plaintiff, deraigning title from the state, did not mention certain forfeitures to the state in the petition, but alleged ownership generally, and, in support of such general allegation, introduced evidence regarding the forfeitures, to which defendant did not plead surprise, the evidence, admitted without objection, will be considered even though not properly admissible under the pleadings.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3262–3272, 3274–3277, 3289; Dec. Dig. ☞837.]

**9. TAXATION ☞679—FORFEITURE TO STATE—STATUTE.**

Under the Revenue Act of April 20, 1877 (Act No. 96 of 1877), superseding Act No. 42 of 1871, providing, in section 53, that on the first Monday of December the properties posted for delinquent taxes were to be offered for sale at public auction, and, if the required amount was not bid on any particular property, it was to be adjudicated to the state, certificates of forfeiture for delinquent taxes, not reciting that the property was ever adjudicated to the state, but only that a list of delinquent taxpayers was filed and recorded, did not show that the property was transferred to the state for nonpayment of taxes.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1361, 1362; Dec. Dig. ☞679.]

**10. TAXATION ☞421—TAX SALES—DESCRIPTION OF LAND.**

In a petitory action by a plaintiff deraigning title from the state through tax sales, where it was not suggested that the owners of the land owned any other property in the square than what was assessed to them by the descriptions in the acts of the tax sales, nor that the measurements and the numbers there given for the lots were not exact according to some plan of the city, the description of the land in the acts was sufficient.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 720–727, 729–735; Dec. Dig. ☞421.]

**11. TAXATION ☞415—TAX SALES—VALIDITY—ASSESSMENT AFTER DEATH OF OWNER—SUFFICIENCY OF EVIDENCE.**

In a petitory action where plaintiff claimed from the state, which acquired title through tax sales, evidence *held* insufficient to show that the assessment for which the lots were sold was made in the names of deceased owners, so that the sales were void.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 695–698, 700–703; Dec. Dig. ☞415.]

**12. TAXATION ☞788 — TAX SALE — CONCLUSIVE EVIDENCE OF ADVERTISEMENT — STATUTE.**

By direct provision of Act No. 82 of 1884, § 3, a tax collector's deed is conclusive evidence that the sale was advertised according to law.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1555, 1557, 1559–1569; Dec. Dig. ☞788.]

**13. TAXATION ☞745 — TAX SALE — CONCLUSIVENESS OF DEED AS TO ADVERTISEMENT—STATUTE—CONSTITUTIONALITY.**

Act No. 82 of 1884, § 3, making a tax collector's deed conclusive evidence of a tax sale's having been advertised according to law, was within the authority of the Legislature to pass.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. ☞745.]

**14. TAXATION ☞693—TAX SALE—PRESUMPTION OF REGULARITY—EFFECT.**

In a petitory action where plaintiff claimed through the state, which acquired title through tax sales, the presumption of regularity attaching to such a sale, in the absence of contrary proof, led to the conclusion that the lands in question, part of a square containing 13 or 16 lots, in which 29 were assessed, were not among those doubly assessed.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1388; Dec. Dig. ☞693.]

**15. ADVERSE POSSESSION ☞57 — PRESCRIPTION—SUFFICIENCY OF EVIDENCE.**

In a petitory action by plaintiff deraigning title from the state, which held under tax sales, evidence *held* insufficient to show that defendant or her authors in title acquired title by 30 years' prescription.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 277, 278, 655, 667, 687; Dec. Dig. ☞57.]

**16. JUDGMENT ☞654—DISMISSAL — CONCLUSIVENESS.**

In a petitory action the judgment of dismissal in plaintiff's prior suit in ejectment against defendant's predecessors in title did not bar evidence showing that a lease was executed by plaintiff to such predecessors as tenants, since the judgment did not settle that the execution of the lease did not exist as a fact.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1165; Dec. Dig. ☞654.]

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Petitory action by W. W. Wall against Annie Winter Rabito. Judgment for defendant, and plaintiff appeals. Judgment appealed from set aside, and judgment ordered for plaintiff.

Johnston Armstrong and Hall, Monroe & Lemann, all of New Orleans, for appellant. Charles I. Denechaud and F. Rivers Richardson, both of New Orleans, for appellee.

LAND, J. [1] The motion is based on allegations that the appellant has not produced a complete transcript of the evidence adduced below, and the appellee prays that the appeal be dismissed, or that the omitted evidence should be sent up.

After the motion to dismiss was filed the appellant applied for a writ of certiorari to correct the record, and the clerk below has made his return, supplementing the transcript, and certifying that the record now contains all the evidence which was filed in the case. The return, however, recites that some offerings by appellee made by reference were not included in the transcript because copies were not furnished or the originals filed.

We think that the best disposition of the motion under the circumstances is to refer it to the merits, with leave to parties to supplement the transcript by the production of the original, or copies, of all documents offered below as shown by the notes of evidence.

It is therefore ordered that the motion to dismiss be referred to the merits, with leave to parties to supplement the record by producing any and all missing documents offered below as shown by the notes of evidence.

### On the Merits.

PROVOSTY, J. This is a petitory action involving 10 lots of ground fronting on Melpomene street in this city, numbered 1 to 10 and constituting the entire frontage of the square; and also a certain area back of these lots. The side streets are Prieur and Johnson, and the parallel street is Thalia. The square is situated in that part of the city limits which up to recent years was a swamp more or less water covered the year round. Melpomene is 128 feet wide, and runs from the river to the lake. On it, for its entire length, is a large canal, dating from before, or during, the war, for draining the front, or inhabited part, of the city. On that side of this canal on which the square in question is, the earth excavated from this canal raised the level of the street some 4 or 5 feet above that of the surrounding country, thus forming a ridge extending, like the canal itself, through this swamp. On this ridge Hannah Merritt and her husband squatted opposite the square in question. They built themselves one of these nondescript shanties, or shacks, constructed of odds and ends, such as are seen on the outskirts of cities, and inclosed, and cultivated in truck, the ridge on each side of the shanty. At what date they thus took possession, and how far, if at all, their inclosure extended into the square, are the questions in the case.

The possession, such as it was, was continued by Hannah Merritt and her son Tom Jones after the death of her husband, which occurred in 1891, and in 1911 the defendant bought from her and her son their prescriptive rights. We may mention, though unimportant, that the price was $2,500, and was not to be paid until the prescriptive title to the property should have been judicially decreed, and that these vendors have since died.

As to the area back of the front lots plaintiff traces title to the original owners by private sales. As to the front lots plaintiff holds a deed from the state, and claims that the state acquired by two tax sales made in 1888, and also by two forfeitures in 1878 or 1879.

The deed from the state gives the said tax sales as being the source of the state's title, and makes no mention of the said forfeitures. In like manner, the petition of

plaintiff, in setting forth the chain of plaintiff's titles, mentions only the said tax sales, and is silent as to the said forfeitures. In the briefs, however, plaintiff invokes and relies upon the forfeitures.

[2-4] Defendant contends that in making the transfer from the state to plaintiff the forms of law were not complied with. But she is without standing for raising that question, as it is one in which the state alone could possibly have an interest. And, moreover, in that connection it is to be noted that if her possession has never matured into a title, she is a mere trespasser, and that as against a trespasser a plaintiff in a petitory action is not required to show a title good against the whole world, and that, on the other hand, if her possession has matured into a title, this transfer is as to her res inter alios acta, or, in other words, a thing with which she can have no concern.

[5] She has an interest, however, in contesting, as she does, the validity of the said tax sales to the state, for, in the event of their having had the effect of transferring the title to the state, she would have to trace her possession much farther back than she would otherwise have to do in order to establish her 30 years' prescription, for the prescription acquirendi causa does not run against the state; hence, if the title to this property was transferred to the state by said tax sales, the term of the prescription would have to have begun 30 years back of 1888; whereas if the title was not thus transferred, the term of the prescription would not have to have begun further back than 30 years before the tax sales of 1888 or of whatever interruption may have been brought to it, either by this suit or otherwise.

But, strangely enough, while defendant contests the validity of the said tax sales of 1888, she does not contest that of the said forfeitures; on the contrary, she seeks to use them as a weapon against plaintiff by making the point that plaintiff puts himself out of court when he shows the title to have become vested in the state as an effect of these forfeitures—on the principle that:

"Proof of an outstanding title better than plaintiff's is a good defense to a petitory action." Shreveport v. Marks, 117 La. 143, 41 South. 444.

[6] To our mind it is very evident that any title the state may have acquired through these forfeitures passed to plaintiff by the state's deed to him, even though not mentioned therein, for it is elementary that a vendor cannot set up against his vendee any title which he held at the time of the sale.

[7, 8] Possibly the learned counsel of defendant are under the impression that the said forfeitures cannot be considered as forming any part of plaintiff's chain of titles because they were not mentioned when, in the petition, the title relied upon by plaintiff was deraigned; but this impression would be entirely erroneous. Plaintiff alleged himself to be owner, and could support that allegation by whatever evidence might tend thereto. If that allegation was too vague, this might have been ground for objection to the evidence in support of it, by reason of surprise; but defendant did not plead surprise when said evidence was offered, and the evidence was admitted without objection. Such being the case, this evidence would have to be considered even though not properly admissible under the pleadings, for, if not thus admissible, its admission without objection would have had the effect of enlarging the pleadings.

If defendant were in reality not contesting the validity of these forfeitures, but were conceding that they had had the effect of vesting the title in the state, we might spare ourselves the trouble of inquiry into the validity of the tax sales, for, the question being as to whether the title of the original owners had passed to the state, it could make no difference whether it had

so passed as an effect of the forfeitures or of the tax sales. But we think defendant must be taken to be contesting the validity of these forfeitures, although she does not do it expressly, but on the contrary would appear to be doing the very opposite; for, as just shown, it would be useless for her to be contesting the tax sales if not also these forfeitures, and she is contesting the tax sales. Her attitude in the case is one of contending that the state never had any title at all.

We have therefore to inquire into the validity of these forfeitures. The sole evidence bearing upon them consists of two certificates of similar wording (dates and amounts alone being changed), one for the taxes of 1876, and the other for those of 1877, reading as follows:

"Office of Register of Conveyances,
"State of Louisiana, Parish of Orleans.

"This is to certify that there is on record in the office of the register of conveyances the delinquent list of state taxpayers for the 4th district of the parish of Orleans for the year 1876, said list being known as Book ...... in said office; that on page 12 of said delinquent list of said district for said year is the following entry, to wit:

ed entry on the said delinquent list has not been canceled and the same remains of record in the said book above described.
"Nov. 18, 1912. [Signed] W. E. Connolley,
"Conveyance office.   Register of Conveyance.
"Fee fifty cents.                           [Seal.]
"Received payment.     Allen Jumel,
     "[Signed]   W. E. Connolley
               "Auditor of Public Accounts,
"[Seal.]                   State of Louisiana."

Prior to the Constitution of 1879 the taxes of one year were collectible the next. Under the Revenue Act of 1871 (Act 42, p. 104, of 1871), which continued in force until the adoption of Act 96, p. 136, of 1877, taxes became delinquent on the second Monday of December of the year in which they were collectible; and it was then the duty of the tax collector to make out and transmit to the recorder of mortgages of the parish in which the property was situated a list containing the names of the delinquent taxpayers and a description of their properties; and it was the duty of the recorder in the city of New Orleans to record said list and transmit a copy of it to the state auditor of public accounts on or before the second Mon-

Description of Property. 1876.

| Name. | Lot. | Square. | Street. | Dimensions. | Boundaries. | Assessment. | Tax. |
|---|---|---|---|---|---|---|---|
| Doherty, Hugh | 1 to 10 | 432 58 | Prieur, Johnson | 11x163 303 | Thalia Melpomene | 75 | 108¾ |

"And I further certify that at the end of said delinquent list of the said district for the said year is the following certificate, to wit:

  " 'State of Louisiana, Auditor's Office.

           " 'New Orleans, Feb. 25th, 1878.

  " 'I hereby certify the foregoing to be a correct copy of the original list of the delinquent taxpayers (taxes of 1876) of the fourth (4) district, parish of Orleans, as filed in this office.

  " 'Witness my hand and seal of office this 25th day of February, 1878.'

"And I further certify that the above-mention-

day of December. Sections 66 and 67. And section 68 provided:

"That the said delinquent list * * * when so filed in the office of the auditor of public accounts, shall be entered by him on a record kept * * * for that purpose, and shall vest, from the day of filing, a title to the lands and lots therein returned, in the state of Louisiana, which shall be impeachable only on proof that taxes for nonpayment whereof the lands were returned forfeited had been in fact paid to the collector before the return of the list to the recorder."

[9] The said act of 1877, which went into effect on the day of its passage, April 20, 1877, superseded the act of 1871, and made the following modifications: Taxes became delinquent on the first Monday of November (section 53); on the second Monday of November a seizure of the property was required to be made by posting at the door of the courthouse the names of the delinquent taxpayers and the amount of taxes due by them (section 53); on the first Monday of December the properties were to be offered for sale at public auction, and if the required amount was not bid on any particular property it was to be adjudicated to the state (section 53). What thereafter was to be done the statute did not provide, in so far as the city of New Orleans was concerned. Outside of the city of New Orleans, a list of the properties thus adjudicated to the state was to be made and filed in the offices of the parish recorder and the state auditor of public accounts, and this filing was to vest a title to the property in the state. Sections 59, 60, and 61.

The said certificates, it will be observed, do not recite that the property here in question was ever adjudicated to the state, but only that a list of delinquent taxpayers was filed and recorded. This mere filing and recordation of a delinquent list was sufficient to operate a translation of the property to the state under the act of 1871, but not under the act of 1877, which, as has been stated, went into effect in April of that year—several months before the taxes of 1876 became delinquent. We conclude that these certificates do not show that the property in question was transferred to the state for nonpayment of the taxes of 1876 and 1877; and we pass to the consideration of the validity of the tax sales of 1888.

[10] The two sales were made for the taxes of 1884, and are exactly alike, except that the one deals with lots 1 to 5, assessed in the name of Mary Clark; and the other, with lots 6 to 10, assessed in the name of Hugh Doherty. Mary Clark was the divorced wife of Hugh Doherty; and he, on February 10, 1877, made a sale to her of lots 1 to 5.

The first ground of attack on these tax sales is that the description was not sufficient to identify the property. The description in one of the acts reads:

"Five certain lots of ground in the fourth district of the city of New Orleans in square bounded by Prieur, Johnson, Thalia, and Melpomene streets, designated as lots 1 to 5 in square No. 432, measuring 29 feet 6 inches front by 304 feet in depth."

The description in the other act reads:

"Description of property: Five certain lots of ground and improvements thereon in the fourth district of the city of New Orleans in square bounded by Prieur, Johnson, Thalia, and Melpomene streets, designated as lots Nos. 6 to 10 in square No. 432, said lots 6 to 10 measure 29 feet 6 inches front on the whole square by a depth of 204 feet."

It is not proved, nor, indeed, even suggested that Mary Clark and Hugh Doherty owned any other property in this square than what is there assessed to them and sold, nor that the measurements and the numbers here given for these lots are not exact according to some plan of the city. Such being the case, we cannot consider this ground of attack as being seriously relied on.

[11] The next ground of attack is that a white person by the name of Widow Mary Clark is shown to have died on November 30, 1883, and that therefore Mary Clark was dead when this property was assessed to her in 1884, and that Hugh Doherty was also dead, since Mary Clark had become a widow, and that the assessment having been made in the names of the owners after their death, the sales are null.

The weak point in this argument lies in the fact that the name Mary Clark not being an uncommon one the fact that a person of that name died, would not prove that the Mary Clark, divorced wife of Hugh Do-

herty, had died; and still less would the death of a widow by that name make such proof in view of the fact that the Mary Clark with whom we are concerned was a divorced woman who could have become a widow only by remarrying and losing this second husband by death.

[12, 13] The next ground of attack is that whereas the tax sale was advertised to take place at 11 o'clock. a. m., the last publication of the 30 days' advertisement required by law, did not appear until 2 o'clock p. m. of the same day.

The facts would be found to be as here stated if they could be inquired into, but they cannot. Section 3 of Act 82 of 1884 makes the tax collector's deed conclusive evidence of the tax sale having been advertised according to law. Such a statute the Legislature had authority to pass. In re Orloff Lake, 40 La. Ann. 142, 3 South. 479; Breaux v. Negrotto, 43 La. Ann. 426, 9 South. 502; Cane v. Herndon, 107 La. 591, 32 South. 33.

The next ground of attack is that:

"As there were 29 lots assessed in this square, and, as there were only 13 or 16 lots in the square, that there was a dual assessment for some of the lots, and this stamps the tax sale with nullity."

[14] We have not deemed it necessary to verify from the voluminous record the statement here made of there having been only 13 or 16 lots in the square and 29 assessed; for even if true, the presumption of regularity attaching to a tax sale would, in the absence of positive proof to the contrary, lead to the conclusion that the lots here in question were not among those doubly assessed.

[15] Assuming, then, that the state became owner of this property and transferred to plaintiff such title as she had, we come to the question of whether the defendant or her authors in title acquired title by the prescription of 30 years.

As already stated, the possession for such prescription would have had to begin 30 years prior to the tax sale of 1888, as to these lots thus acquired by the state tax sale, inasmuch as prescription ceased to run against the state from that date.

Calhoun Cage, colored, testified that he went and lived on the bank of the Melpomene street canal one year after the war, and that the Merritts were then living there in a house they had built. That they had then the same area fenced in which is fenced in at present, i. e., this entire square; that he is certain Wash Merritt, husband of Hannah Merritt, died about 5 years after he had gone to live there. The family Bible and the official certificate of death show that Wash Merritt died on January 20, 1891. This witness also testifies that he himself went to live there after he left Mr. Farrell's house; and the record of the suit by which he was ejected from the Farrell premises, shows that this was in March, 1901.

Adam Wilson, colored, testified that he and Calhoun Cage went to live out there at the same time; that this was some 5 years after the war, in the latter part of 1869, and that the Merritts had gone there about a month or two previously; that there was—

"a great big thicket there; you couldn't hardly see where the fence was. I went on the lower end of it, and saw it ran out as far as Thalia street. There was nothing but water there. When you went out there you had to go through the water to your waist."

He says that Wash Merritt lived 7 or 8 years after he, witness, went to live out there. This would fix 1882 or 1883 as the year of his going out there, for Wash Merritt died on January 21, 1891. This, by the way, is about the time plaintiff's witnesses say the Merritts did move out there. This witness says in one place that the cultivation extended beyond the high bank of the canal into the swamp or beds that were thrown up; and in another place he says

that the cultivation was confined to the bank of the canal. He says he does not know how far the fence went towards Thalia street; that "it was a thick woods there, and I didn't go in there—it was nothing but water and vines and everything"; that unless one was on the bank of the canal, one could not see through this thicket.

Another witness of defendant's is Tom Jones, one of her vendors. He says that he and his mother, Hannah Merritt, moved to this place during the war, and that they at that time built a fence inclosing this square. But this witness is so discredited by his own contradictions, and the conflict between his statements and those of other witnesses, that no weight can be attached to his testimony.

Sarah Sims, another witness of defendant's, is a very old, bedridden colored woman who impresses us as being weak-minded, and entirely willing to testify to anything a leading question from either side may suggest to her.

Lee Trenchard, another witness of defendant's, testified: That he is 46 years old, and knew Hannah Merritt living on the bank of the canal in 1878. That he happened to know her by hunting out there as a little boy. That they were planting fields out there—had fields there planted—making gardens, a truck farm. That her fences were made out of willow saplings about the size of his finger, some stuck in the ground and some running across. That this fence extended about a square out from the canal; and in this space thus inclosed they had made ridges about 2 feet apart extending from the canal bank into the swamp and planted okra on the top of these ridges. That the top of these ridges was too wet for corn.

While this witness' testimony is consistent enough, it has the feature of gathering strength as he proceeds; he is, evidently, a willing witness for defendant. He was questioned, and answered:

"How old were you when you started going out there to hunt? A. I guess about 8 or 9 or 10 years. Q. You started hunting when you were 8 or 9 or 10? A. Yes, sir; I was hunting when I was 5 years old. .Q. Grasshoppers? A. No, sir. Q. What were you hunting when you were 5? A. I was hunting with my father."

Rose Celious, a colored witness of defendant, testifies that she went to Springfield in June, 1878, and returned in February, 1879; that Hannah Merritt was living out there then; that she met her out there; that she knows the year because her oldest child was born that year; that the occasion of her going out there was to see a sick child—child of Tom Jones, and grandchild of Hannah Merritt.

In this statement as to the date of this visit to this child this witness' testimony is in contradiction with that of Modeste Jones, wife of Tom Jones, also a witness for defendant, who testified that she and Tom Jones went to live with Hannah Merritt after the death of Wash Merritt; the date of which death is positively fixed in the record as January 20, 1891.

George Adams testified that he was born in 1853, and is 59 years old; that he was 23 when he married, and that the first time he saw Hannah Merritt out there was about a year after his marriage; that she was then cultivating "from the edge of the canal clean back by Thalia"; that the house was out in the field "a little over one-half a square from the canal bank." That they made garden beds, with trenches between. According to this witness these trenches were dry the greater part of the time; were wet only after a rain, and would soon dry up. The statement of this witness that the house of Hannah Merritt was over half a square from the canal bank is in opposition to all the other witnesses and to the fact that the

house had to be moved when the canal was enlarged.

W. C. O'Rourke, another witness for defendant, testified that he is 50 years old; that he knew Hannah Merritt 35 years ago; that he fixes the date by the yellow fever epidemic of 1878; that she then resided on the bank of the Melpomene canal; that he was living near there and had a lot of mules and cows running up and down there all the time; that Hannah Merritt had nearly two squares inclosed; that her fences appeared to him to go about a square beyond Thalia street; at that time there were two houses on the square; that they were putting a little garden in there, but that he does not know what they were cultivating; that the ground was swamp, but that they had little hills dug in between extending from the bank of the canal towards Thalia; that the fence stopped where the hills stopped; that he would go crawfishing between the garden hills of Hannah Merritt; that these hills were at right angles with the canal and were about 40 or 50 feet long; that the water in them was at times waist deep; that only the little hills were dry in the rainy season; that he does not know how high these hills were; that the water when high was about 4 feet, and when low about 2 feet; that the canal bank where the house was, was about 4 feet higher than the land further back; that the enlargement of the canal took in the place where the house originally stood.

"Q. The fence ran no further back than the hill, it stopped where the hill stopped? A. Exactly, to the best of my knowledge. I did not go to see how far back the fence ran. But I seen it run near to Erato street, through Prieur and through Johnson street. Q. Erato street was not cut at the time? A. No, sir; nothing but swamp and trees. Q. A pretty thick growth of willows there? A. Yes, sir; back of Roman. Q. How far could you see through the willows? A. Couldn't see through them at all. Q. You just walked on the bank of the canal and looked back? A. Walked on the bank, and when I was inside walked on the hills. Q. You didn't go past the hills at all, never in the water? A.

No, sir. Q. The furthest you ever went back was the end of the hill? A. Yes, sir. Q. And you couldn't see through the willow thicket at all? A. Sometimes you could, and sometimes you couldn't. Where the willows were small you could see. Q. Behind Hannah Merritt's house could you see through the willows? A. Some of it you could, and some of it you couldn't."

Later on this witness was questioned, and he answered as follows:

"Q. When you first knew her was after her husband had died? A. I think so, or before—I don't remember him. I guess I would have remembered him if I had seen him. Q. The chances are that when you first saw her it was after her husband had died? A. I don't know whether he was living or not. Q. If you had been crawfishing to her house repeatedly and he had been living, you would have seen him? A. Not repeatedly—very seldom I went there; and most times was on account of the animals."

Later on the witness testified that Tom Jones came there "a year after the old woman." That Hannah Merritt "was there when I came there. I was a young man when I went there." This witness was questioned on cross-examination, and he answered as follows:

"Q. Are you the same O'Rourke who had a suit with Mr. Wall, and you lost the suit? A. Yes, sir. Q. What was that suit over, a piece of property? A. Yes, sir. Q. How long ago was that? A. About a year next month, I believe. Q. That is the same Mr. Wall here, the same who is plaintiff in this suit? A. Yes, sir."

On re-examination in chief he was questioned, and he answered:

"Q. You have been asked about a suit which you had with the plaintiff in this case. Does the fact that you had such a suit, or the rendition of the judgment in that case affect your testimony in any manner? A. No, sir. I am as good a friend of Mr. Wall as I ever was. I have nothing against him for it. If I could do him any good I would. Q. Have you any interest in this controversy whatever? A. None in the world. I would the same way with him if I was a witness for him. Nothing in the world against Mr. Wall. I have been talking to Mr. Wall."

The foregoing is, in substance, the evidence produced by defendant to establish a 30 years' possession. It shows positively that at a time in the past which was either

shortly after the War or else 6 or 7 years before the death of Wash Merritt in 1891, the Merritts squatted on the bank of this canal within the limits of Melpomene street, and cultivated the bank of this canal in truck. It shows also—although with less positiveness—that the inclosure extended into the swamp beyond the limits of the embankment along the canal, but whether beyond the limits of the street or not, which was 128 feet wide, is left somewhat doubtful. It shows also, but by testimony of a doubtful character, that the inclosure included the entire square. Unsatisfactory as the latter evidence is, when critically examined in the light of the admission of the witnesses as to the swampy character of the place and the impenetrableness of the thicket growth upon it, we are not prepared to say that, considered by itself alone, that is to say, irrespective of the evidence offered by plaintiff, it might not suffice to show possession of the entire square; but when considered in connection with the latter evidence, it is found to be entirely unreliable.

When C. Uncas Lewis, the surveyor, made a survey of the adjoining square, Melpomene, Prieur, Thalia, and Roman, in October, 1898, he found that the canal was 25 or 30 feet wide, and Melpomene 128 feet, and the embankment made by the excavated earth, about 40 feet, and that this elevated part was entirely in the street; that beyond this embankment in the swamp was water; that, as far as he could judge, not going over the ground but looking over it from the Prieur street end of the square, it would have been impossible to cultivate anything there, and that any garden bed in that square could hardly have escaped his observation as he was looking for dry ground; that the canal has since then been considerably widened; that most of what was the canal bank then is now in the canal.

Walter J. Griffin testified that he is clerk of the civil district court of the parish of Orleans, and is 36 years old; that he was born and raised near the locality in question, and as a boy used to go crawfishing on the banks of this canal; that the land there was a water covered swamp to within about 50 feet of the canal, which there was no chance of any one cultivating; that there were little houses on the bank of the canal, none off it; that the place ceased to be a swamp 10 or 15 years ago; that if there had been any fencing out on the square in question he would have seen it; that he was over that ground pretty nearly every day when he was a kid.

W. W. Wall, plaintiff, testified as follows:

"Q. Will you state to the court what the condition of the property was when you first knew it in 1893 or whatever date you first knew it? A. About that time I visited this locality with old Col. Theodore Stark and we looked more particularly, or tried to look, at some property further towards the lake than this which Col. Stark told me he owned, he was trying to sell it to me. The bank of the Melpomene canal looked to me about 20 or 25 feet wide, and 4 or 5 feet high, and back of the old drainage machine, which was on Melpomene and Claiborne, there were a few houses erected on this bank, and the darkies lived in them and cultivated garden truck; these shacks were made out of palmetto and those that were not of palmetto were wood and tin—very small, and all on this bank. Immediately off the bank the land was entirely covered with water and there was no cultivation whatever. The next time I was in that vicinity was— Q. Will you state what the condition of the property was between the I. C. tracks, on Howard avenue, or Delord, and Melpomene—beyond the base of this canal bank? A. It was all covered with water, except in the square that fronted on Claiborne street. This Melpomene canal was called, as I recall, the Melpomene tailrace, and it was not a drainage canal at all for the land lying back of Claiborne avenue. The water in the canal was always higher than it was on the land adjacent to it. Whenever the pump on Claiborne street was in operation they pumped water from the city in the canal. The country was in such condition that you could not walk anywhere off of this bank. About 1895 or 1896 I represented the plaintiff in a law suit, when Mr. George Untereiner represented the defendant, and at that time I was out a number of times on the square of ground that was at that time the last square in the filled area. The city used this locality for years as a dumping ground, and about 1895 there were about 1½ or 2 squares this side

of the property involved in this controversy, on the city side, and at that time it was impossible to go any further in the swamp than the edge of the dump. They were filled with garbage there about 5 or 6 feet. When the stuff was first dumped in at that time the conditions were the same as when I went out there with Col. Stark. Q. Did you ever have occasion to go out the Melpomene bank on a bicycle? A. Yes, sir; I did once. Q. When was that? A. That was some time before 1898, because I went there with a young lady and we tried to ride that bank. We went out quite a ways on the path on the bank. Q. Were there any fences obstructing your progress along the bank? A. Not at that time, not on top of the bank. There was a path that was used a good deal for foot passengers, and we rode out on this path. I remember distinctly I came near falling in the ditch out there and I know it was before 1898, because that was before I was married, and I was married in 1898."

W. H. Howcott testified that Wash Merritt, whom he knew well, lived on Freret street in 1879, and on Josephine and Locust streets in 1882 and until 1884; that Col. Theodore Stark having offered to sell him these swamp lands in 1890 he made several inspections of them at that time, and found Wash Merritt living on the bank of this canal, who told him that he had lived there since 1887; that the squatters on the bank of this canal had spread out the earth excavated from the canal and were cultivating this bank, but that the land beyond this embankment was a water-covered swamp, and that there were no fences in it; that it was a morass; that he could not get it surveyed.

William Molligan testified that he purchased property in the adjoining square in 1896; that the water was 3 to 4 feet deep on the property he bought, which was just the width of the street distant from the square in question; that there were fences and planting on the embankment, but none beyond, which was nothing but a swamp.

Solomon Reinach testified that in 1893 he owned the adjoining square and visited the locality frequently at that time; that he never walked on the bank of the canal; that the water on his square was in some cases 2 feet deep; that the enlargement of the canal had no effect towards draining his square; that so far as he knows there was not any cultivation between the bank of the canal and Thalia street.

George Untereiner, the lawyer, testified that from 1884 to 1892 he was frequently in that locality, and that he had occasion to visit the neighborhood again in 1898 or 1899 in connection with a lawsuit in which one of the neighboring squares was involved, and that there was at that time a strip of land 40 to 50 feet in width cultivated along the bank of the canal, but that beyond this was woods almost always covered with water as much as knee-deep, and that "his recollection is that there was a fence extending along right behind the strip of cultivated land, separating it from the woods—a kind of pole fence. Outside of that, none."

John Weaver, a lineman of the Railways Company, who lived all his life in proximity to the square in question, and for a time ran a dairy in the neighborhood, testified that the water in this swamp was at times waist-deep and at times knee-deep; that the only cultivation he ever saw in that locality was on the bank of the Melpomene canal; that no part of the swamp was cultivated; that he saw no fences there before 1901; that he was partly the fault of the fences being put up as his cows used to get on the bank and dig the gardens up; that 30 years ago he used to fish and trap out there and saw no fences.

Modeste Jones, witness for defendant, testified that she was the widow of Tom Jones; that she was married to him in St. Charles parish two years before the yellow fever of 1878; that she lived in that parish about 5 years after her marriage, and then came to New Orleans, and lived on Rocheblave street about 5 years, and then moved to live with Hannah Merritt, after the death of Wash Merritt; that Hannah Merritt then wrote to Tom Jones to come and live with

her. The date of the death of Wash Merritt, as already stated, was January 20, 1891.

Jos. Duval, colored, testified that the Merritts moved out there in 1886 or 1887.

Burrill Davis, colored, testified that Hannah and Wash Merritt lived on St. Andrew street in 1884, 1885, and 1886.

Joe Jackson, colored, whose testimony makes a much more favorable impression than that of any of the other colored witnesses, testified that it was he who moved the houses from the bank of the canal when the canal was enlarged; that after you got off the bank of the canal you went into mud and water; that Wash Merritt was his uncle, and he does not remember in what year he built his house, but remembers when he bought the lumber and floated it in the canal; that after 2 or 3 years his uncle ran a fence; that this fence was on the bank; that his uncle cultivated on both sides of the house, but not back of the house, there being too much water; that he, witness, moved to this city from St. Charles parish when the Davis crevasse occurred, and that his uncle was then living on Josephine street.

The Davis crevasse occurred in 1890.

Jos. Duval and Burrill Davis testify to there having been no fences and no cultivation beyond the elevated ground along the canal, but, putting aside altogether their testimony, as having been more or less shaken on cross-examination, we think the other evidence, as a whole, shows very conclusively that the original occupation by Hannah and Wash Merritt did not extend beyond the limits of Melpomene street until within a comparatively recent period, and that it began many years after the time when it would have had to have begun in order to fill out the 30-year prescriptive term.

And that conclusion is confirmed by the fact that in 1906 Thomas Jones leased this square from the then owner, the Quaker Realty Company; and when later an agent of plaintiff served a notice upon him to vacate, his answer was that "he had been minding the property too long for Mr. Howcott, that he would have to do better than that." And W. H. Howcott testifies that Hannah Merritt sent for him, as her landlord, in 1905, to defend her possession against the contractors for the second enlargement of Melpomene canal, and he produces a letter which he then addressed to said company in that connection; and this is corroborated by the testimony of W. W. Wall, the plaintiff.

[16] The present petitory action was instituted only after a suit in ejectment of Hannah Merritt and Tom Jones as tenants had failed. The defendants in that suit denied the lease and claimed title by prescription of 30 years, and the suit was dismissed. For what reason we are not informed. The defendant in the instant suit now contends that the judgment dismissing that suit is res judicata as to the execution vel non of the said lease, and is a bar to the admission of any evidence to show that such a lease was executed.

We do not think so. The said judgment divests the said alleged lease of all legal force, so that it could not now serve as a basis for a right of action; but said judgment does not make that the execution of said lease does not exist as a fact; and if the said fact does exist, it may be proved like any other fact relevant to the issue in the case. It may be well to mention that the said city court was without jurisdiction of the question of title to real estate, and that such a thing is possible as that the city court may have dismissed the said suit from a mistaken idea that it involved a question of title to real estate.

If this attorning to plaintiff's author in title were entirely disregarded, however, the overwhelming weight of the evidence would still be against the defendant's possession or that of her authors in title having embraced

this square, or of its having begun 30 years before the institution of this suit and still less before the sale to the state in 1888. The possession which defendant's authors in title had of the street could not, as a matter of course, serve as a possession of the square. Besides, it is not so certain that even the possession of the street was animo domini, and not by license of the mayor.

The judgment appealed from is therefore set aside, and it is ordered, adjudged, and decreed that the plaintiff, William Winans Wall, have judgment against Mrs. Annie Winter Rabito, recognizing him as the owner of the property claimed in this suit and fully described in the petition herein, and that the defendant pay the costs of this suit.

In this cause the Chief Justice takes no part.