PITTMAN et al. v. GULF REFINING CO. et al.

No. 532.

District Court, E. D. Louisiana, New Orleans Division.

Jan. 30, 1942.

Milling, Godchaux, Saal & Milling and Cobb & Saunders, all of New Orleans, La., for plaintiffs and intervenor Irwin P. Martin.

George C. Schoenberger, Jr., of Houston, Tex., and Monroe & Lemann, of New Orleans, La., for intervenor Shell Petroleum Co.

Michael M. Irwin, of New Orleans, La., for defendant Victoria M. Guidry.

William A. West, Jr., of New Orleans, La., for defendants Ernest A. Thibodeaux et al.

J. S. Atkinson and Fréd E. Greer, both of Shreveport, La., John E. Green, Jr., of Houston, Tex., and Denegre, Leovy & Chaffe of New Orleans, La., for defendant Gulf Refining Co et al.

BORAH, District Judge.

Plaintiffs, Roberta Pittman, Sarah Pittman, Bessie Pittman Lawrence, widow of J. E. Lawrence, Ethel Pittman Lawrence, wife of T. D. Lawrence, Ernest S. Martin and intervenor Irwin P. Martin are the sole heirs of John B. Pittman (Jr.), who died intestate in the year 1927. John B. Pittman (Sr.) died testate in the year 1885, and it is admitted that John B. Pittman (Jr.), together with plaintiffs, Irwin P. Martin and other persons whose rights were subsequently purchased by John B. Pittman (Jr.), acquired by inheritance from John B. Pittman (Sr.) whatever title he had to the property in controversy. The petition of plaintiffs, as amended, alleges that they are the owners of an undivided 169/180ths interest in, "A tract of land situated on the East Bank of Bayou Lafourche, the South line of which is a line running East from Bayou Lafourche and commencing at a point on the East bank of Bayou Lafourche which lies South 3°20′ West, 2299′ from the southeast corner of the most Easterly pier of the Louisiana Highway Commission Bridge crossing Bayou Lafourche and the South Louisiana Canal and Navigation Company Canal at or about their intersection; and the North line of which is a line running parallel with said South line and distant 2806 feet North therefrom; and which said property is bounded on the West by Bayou Lafourche and on the East

by the property of Mrs. James L. Roxburgh and the City of New Orleans, et al." Having thus described the property with respect to its location on the ground, plaintiffs next allege that said property is situated entirely within lot 7, Section 23, and lots 1, 4 and 5, Section 26, Township 21 South, Range 22 East, Parish of Lafourche, State of Louisiana. But this apparently is not their present position, for in the briefs filed herein plaintiffs contend that they are the owners of a tract of land which is formed of lots 1 and 4 and a strip across the north end of lot 5, Section 26, T. 21 S., R. 22 E., and they assert their title to lot 7, Section 23, T. 21 S., R. 22 E., which lies immediately to the north of lot 1 of Section 26, only in the event the court should reach the conclusion that any of the property involved in this litigation is in said lot.

Intervenor Shell and defendants Victoria M. Guidry et al. make no claim to lot 7 and contend that the property in controversy is located in lots 1, 4 and 5, Section 26.

It is admitted that the record title of plaintiffs, intervenor Irwin P. Martin, intervenor Shell Oil Company, Incorporated, and defendants, Victoria M. Guidry, Charles W. Thibodeaux, Ernest A. Thibodeaux and Mary G. Thibodeaux Oschwald, to lots 1, 4 and 5, Section 26, T. 21 S., R. 22 E., and the record title of plaintiffs and intervenor Irwin P. Martin to lot 7, Section 23, T. 21 S., R. 22 E., are as set forth in the pleadings. Plaintiffs allege that lot 7, Section 23, was acquired by Pierre A. Thibodeaux from the State of Louisiana, and by mesne conveyance became the property of John B. Pittman from whom plaintiffs and intervenor Irwin P. Martin inherited. This is not disputed. With respect to lots 1, 4 and 5, Section 26, plaintiffs allege that they were acquired from the State of Louisiana by Pierre Thibodeaux; that there is no conveyance of record by Pierre Thibodeaux, but his son, Pierre A. Thibodeaux, conveyed said lots and declared in said conveyance that he acquired them from his father, Pierre Thibodeaux, by act under private signature which had never been recorded; and that John B. Pittman acquired title thereto by mesne conveyance from Pierre A. Thibodeaux. Intervenor Shell Oil Company and the defendants deny, and rightfully so, the correctness of this contention. Plaintiffs further allege that Pierre Thibodeaux died intestate in November, 1873, leaving three children, Pierre A. Thibodeaux, Eugenie Thibodeaux and Joseph Theogene Thibodeaux as his sole and only heirs; and in connection with the allegations which follow, admit that the interest, if any, inherited by Pierre A. Thibodeaux from his father, Pierre Thibodeaux, is owned by plaintiffs and intervenor Irwin P. Martin; that the interest, if any, inherited by Eugenie Thibodeaux is owned by intervenor Shell Oil Company, Incorporated (hereinafter called intervenor Shell); that the interest, if any, inherited by Joseph Theogene Thibodeaux is owned by Victoria M. Guidry, Charles W. Thibodeaux, Joseph N. P. Thibodeaux, Ernest A. Thibodeaux, Frank S. Thibodeaux and Mary G. Thibodeaux Oschwald (hereinafter collectively referred to as Victoria M. Guidry, et al.), plaintiffs and intervenor Irwin P. Martin.

In paragraph V of the original petition, subparagraph E, plaintiffs allege that intervenor Shell, formerly lessee of petitioners under a mineral lease covering said land, purchased whatever interest Annie Laurie Pujos (the only living heir of Eugenie Thibodeaux) owned in said property by quitclaim deed dated June 13, 1931, and agreed that all rights thus purchased by it should be conveyed to petitioners upon payment to it by petitioners of the price which it had expended to purchase same.

The further allegation is made in subparagraph E that petitioners transferred to Frank S. Thibodeaux and Joseph N. P. Thibodeaux an undivided 1/60th interest each in said property and received from each of them a quitclaim of an undivided 1/60th interest therein;

And in subparagraph F: "That while your petitioners have, as hereinabove set forth, acquired the claims or interests in said property made by Annie Laurie Pujos; and by virtue of their prior acquisition from Pierre A. Thibodaux have acquired any interest that he may have inherited from his father, Pierre Thibodaux; and have likewise acquired by quitclaim a part of the interests or claims asserted therein by Joseph N. P. Thibodaux and Frank S. Thibodaux so that to said extent petitioners have the uncontroverted legal title to said property, petitioners do not thereby intend to allege or acknowledge that Pierre Thibodaux owned said property at the time of his death; but on the contrary allege that he had prior to his death sold it to his son, Pierre Thibodaux; and said property is now owned in its entirety by your peti-

tioners in the proportion of 169/180ths, by Joseph N. P. Thibodaux in the proportion of 3/180ths, by Frank S. Thibodaux in the proportion of 3/180ths, and by Irwin P. Martin in the proportion of 5/180ths."

Notwithstanding this allegation, no effort was made to prove at the trial that this deed from Pierre Thibodeaux to Pierre A. Thibodeaux ever existed or that same was inscribed on the public records. Plaintiffs know that their record title is good as to only a portion of the property involved in this litigation, and this is tacitly admitted when they further allege that they have a good ten year prescriptive title which cures any defect in their record title which might otherwise exist because of their failure to prove the existence and recordation of the aforementioned deed. Intervenor Shell and defendants Victoria M. Guidry et al. deny the correctness of this allegation and the same is true with respect to the principal defendants, namely, Louis Bernard, Gulf, Refining Company of Louisiana and Gulf Refining Company (hereinafter collectively referred to as the defendant Gulf), and Mrs. Jeanne Jambon Lefort, Alexis Lefort, Jr., Mrs. Florida Lefort Martin, Mrs. Aurora Lefort Martin and Maxime Lefort (hereinafter called the Leforts). The numerous other defendants in this action are parties in interest who may or will be affected by the judgment rendered herein. It will serve no useful purpose to name them. Sufficient be it to say that they have adopted the pleadings of the principal defendants and are aligned with them in the defense of this action.

A further issue in the case as restricted by the pretrial order is the contention of plaintiffs, intervenors and defendants Victoria M. Guidry et al., that the defendant Gulf acted in wilful bad faith and with knowledge of their rights when removing minerals from the property involved herein.

Apart from the question as to the location of the lands in controversy, it will be observed from the foregoing that the only serious issue between plaintiffs and intervenor Irwin P. Martin on the one hand, and intervenor Shell and defendants Victoria M. Guidry et al., on the other, is with respect to the prescriptive plea of ten years invoked by plaintiffs. In all other respects these parties see eye to eye and present a united front against the principal defendants. To all intents and purposes they are all plaintiffs and they will hereinafter be referred to as such, unless otherwise specially indicated.

In the pleadings filed on behalf of defendants, the lands in controversy are referred to as Lefort lands, Louis Bernard lands and Doucet lands.

In their answers the Leforts have set up title in themselves to only the Lefort lands, and have disclaimed any interest in either the Louis Bernard lands or the Doucet lands. The chain of title set up in the answer of the Leforts and also set up in the answers of defendant Gulf is based on a patent issued by the United States of America to Jesse Lawrence Sanders, who is the ancestor in title of the Leforts. Plaintiffs admit the validity of the title of the Leforts to lots 3 and 4 of Section 23, T. 21 S., R. 22 E., and admit that said lots were acquired by Jesse Lawrence Sanders from the United States of America by patent dated February 17, 1846; that L. R. Sanders acquired the same by inheritance from his father, Jesse Lawrence Sanders, and by purchase from his co-heirs, and that L. R. Sanders and his children sold said lots to J. Noel Lefort and that the Leforts acquired them by inheritance from J. Noel Lefort.

In his answers Louis Bernard has set up title in himself to only a part of the land sought to be recovered herein, which part is referred to as the Louis Bernard lands. In their answers defendant Gulf set up title to only the Doucet lands. In their answers defendant Gulf also set up that they were in possession of the Louis Bernard lands and the Lefort lands and had produced oil and gas therefrom under and by virtue of the mineral leases granted by Louis Bernard and the Leforts. The chain of title to the Louis Bernard lands set up in the answers of Louis Bernard and also in the answers of defendant Gulf is based on a Sheriff's deed to Millien Bernard dated April 2, 1881. This deed was registered on April 5, 1881, in Conveyance Book 20, at folio 126 et seq. of the Conveyance Records of the Parish of Lafourche, Louisiana, and allegedly includes the lands here in controversy, but does not include the Lefort lands.

Defendants admit that they are in possession of the property in controversy, but deny that the Lefort lands constitute any part of lot 7 of Section 23 or any part of lots 1, 4 and 5 of Section 26, and, as to the Louis Bernard lands, deny that they are located as claimed by either plaintiffs, intervenors, or defendants Victoria M. Guidry, et al., but aver that they constitute part of lot 4 of said Section 23, the whole,

except the Doucet lands, of lot 7 of Section 23, and a part of lot 1 of Section 26, and as to the Doucet lands, they aver that they constitute a part of lot 7 of Section 26.

In the alternative, and in the event it should be held as plaintiffs contend that Item 1074 on the assessment rolls for the year 1872 in the name of John B. Pittman includes or covers all of the property involved in this suit, then and in such event, defendants urge that the property covered and included in said Item No. 1074 was forfeited to the State of Louisiana for the non-payment of taxes for the year 1872, and that as so forfeited it was adjudicated to Millien Bernard and was included in the deed of April 2, 1881.

As a further defense to plaintiffs' demands, defendants specifically plead with respect to the Louis Bernard and Doucet lands the prescription of three years under Article 233 of the State Constitutions of 1898 and 1913 and Section 11 of Article 10 of the Constitution of 1921; the prescription of three years as provided in Section 5 of Act No. 105 of the Legislature of Louisiana for the year 1874; and the prescription of ten years acquirendi causa established by Article 3478 of the Revised Civil Code. And with respect to all of the lands involved herein the prescription of thirty years acquirendi causa established by Article 3499 of the Revised Civil Code; and the good faith of the defendant Gulf.

Prior to the alienation of any lands in Townships 20, 21 and 22 South, Range 22 East, said townships were officially surveyed for the United States. Township 21 S., R. 22 E. was surveyed by G. F. Connelly in the year 1837. The north boundary of T. 20 S., R. 22 E. was surveyed by Reuben McCarty and Nathaniel Henderson, Deputy Surveyors, in the winter of 1831. The south boundary, sectional lines and traverse of said township were surveyed by G. F. Connelly in 1837. The north boundary of T. 22 S., R. 22 E. was surveyed by G. F. Connelly and is included in T. 21 S., R. 22 E. The south and east boundaries, sectional lines and traverse were surveyed by G. F. Connelly, Deputy Surveyor, in the fourth quarter of 1837 and the first quarter of 1838. The official plats of these surveys were approved by the Surveyor General's Office on May 18, 1842. All of the parties agree that Township 21 South, Range 22 East, was surveyed incorrectly by Connelly. Both sides admit that there is a north and south shortage on the

ground and defendants' witnesses, Blakemore and Lovell, believe that Connelly also made errors in his east-west lines. Both sides locate the south line of the township in the approximate position called for by Connelly and at practically the same place, but defendants locate the north line of the township about 1172 feet south of where plaintiffs locate the north line. Plaintiffs contend that the north-south shortage amounts to 1468 feet and defendants contend that the shortage amounts to 2640 feet or one-half mile.

This being a petitory action, plaintiffs carry the burden of proof as to the identification between the land involved in this litigation as located and described on the ground, and the lots and sections claimed to be owned by the plaintiffs under their record title. Plaintiffs' primary contention with respect to the location of lot and section lines is predicated upon a theory which they claim was accepted by defendant Gulf and intervenor Shell, and in accordance with which the defendant Gulf prepared maps and boundary agreements in the year 1932. The maps and boundary agreements are in evidence as Defendants' Exhibits 27 and 28, but the maps do not show section numbers and lot numbers as the same were deliberately omitted therefrom. The evidence is convincing that Blakemore, the Chief Engineer of the defendant Gulf, in preparing and using these maps did not intend that they should represent a proper re-survey of the township or allocation of the existing shortage. These maps were prepared as they were because practically all of the inhabitants in that locality had erroneously used the so-called Connelly oak as the corner common to Sections 3, 4, 9 and 10, and they were prepared for the purpose of solving the questions which would have arisen had any attempt been made to fix those boundaries in accordance with a proper re-survey of the township. The City of New Orleans, Mrs. Roxburgh, and Louisiana Land and Exploration Company, among others, are the owners of the land lying back of the lots or west of the lots bordering Bayou Lafourche in this township. The evidence shows that these owners participated in a conference with the defendant Gulf and that this conference was called for the purpose of deciding how the lines should be laid out and how to locate the lots bordering on Bayou Lafourche. At this meeting the conferees were advised by Blake-

more that he could not locate the lots along Bayou Lafourche in accordance with Connelly's survey if he used the oak tree as the corner common to Sections 3, 4, 9 and 10, and that if he did not use the oak tree he could not put all of the lots in there that Connelly called for. In the discussion which followed, a representative of the Louisiana Land and Exploration Company agreed or stated that the lots bordering Bayou Lafourche must have the full amount of acreage called for in their patents or as called for in the government survey and shown by the government plat, and as this was the sense of the meeting Blakemore was accordingly instructed to lay out these lots in any manner that he saw fit, giving to each lot the full amount of acreage called for by the government plat. To do this it was necessary for Blakemore to begin at the so-called Connelly oak, for in no other manner could he accomplish his objective which was to lay out the lots in accordance with the way the majority of owners claimed on the ground.

The evidence in this case also shows that the defendant Gulf and intervenor Shell were both particularly interested in Sections 23 and 26, and, as a matter of fact, both of them were in the field at the same time making independent surveys of T. 21 S., R. 22 E. The engineer then in charge of the Shell surveying party was A. M. Siler, but he was not called as a witness to refute the statements and acts accredited to him, though the evidence shows that he was available. It further appears that none of the Shell engineers ever arrived at a conclusion and all they did up to the time Hertzog was appointed engineer in charge of the drafting and surveying division was to prepare maps showing possible versions of the shortage in the township. After taking over, Hertzog received instructions from his management to construct a map of this area, and as he had not done any of the work in the field and was confronted with four or five versions of the shortage in the township, he realized his dilemma and requested an audience with Blakemore, whom he considered an expert in these matters. The request was granted, the meeting was held and Hertzog was permitted to see, check and fully discuss all of the information and data in the possession of Blakemore. As a witness for the plaintiffs Hertzog was questioned with respect to this meeting and his testimony seemingly confirms the fact that Blakemore adopted the so-called Connelly oak as the real

Connelly oak because he was interested principally in boundary lines and because all of the ownership lines fit in with that version. In any event, Blakemore's testimony is not contradicted by Hertzog, and it is fair to assume that if any of the participants in the aforementioned conference between the Louisiana Land and Exploration Company and others entertained a different view that this record would reflect that fact.

The evidence in this record fully supports the conclusion that the oak tree in question is not in fact the Connelly oak tree. To hold otherwise, the court would be obliged to disregard all of the competent and credible evidence and ignore the fact that every surveyor who testified in this case including Sorrells, plaintiff's only surveyor witness, clearly refutes the Connelly oak tree theory.

Sorrells, the instrument man on the Shell survey party, testified as to his theory of the shortage, a theory which apparently represents his views, but which does not, according to Hertzog, represent any conclusion arrived at by the Shell engineers. Sorrells testified that he used Connelly's field notes in locating the north and south line of the township, and that the shortage which he found amounting to 1468 feet should be allocated ratably to each section from the north line of the township to the south line of the township. But he testified to no fact which would justify his location of the north line of the township, and it is clear that his location of the north line cannot be accepted without disregarding Connelly's survey in its entirety. Nor did he testify to any fact which would tend to show that Connelly's error could not be localized or that it was not localized as testified to by Blakemore and Lovell. From all that appears the conclusion is inescapable that Sorrell's theory is not supported by facts, and same is accordingly rejected as a matter of law.

This brings us to the consideration of the engineering testimony which was offered on behalf of the defendant Gulf. Blakemore and Lovell testified that there is a half mile shortage in the township and they both maintain that Connelly's error is attributable to the fact that he gave a full mile to the straight reach of Bayou Lafourche extending from the southern portion of lot 3 of Section 23 to the southwest portion of lot 4 of Section 26, whereas that straight reach is in fact according to the

official plat only one-half mile in length. They explain their theory of allocating that half mile shortage in this manner. First, they say that as a result of their investigations in the field, which they set forth in detail, they satisfied themselves as to the location of the point of beginning used by Connelly; that having done this, they then proceeded to follow the original surveyor's footsteps exactly in accordance with the courses and distances that he called for until they got to the south line of Section 23, which is four miles from the north line of the township. That on reaching that point they found that if they continued on Connelly's calls that they would leave the bayou entirely, and since they were unable to follow Connelly south any farther, they started again at the south line of the township and retraced or reversed his calls and established the corner common to Sections 26, 27, 34 and 35, which point, according to Connelly's field notes, is located on the west bank of Bayou Lafourche òne mile north of the south line of the township. And as this was the extent to which they could follow Connelly's footsteps they concluded that the half mile shortage in the township should be localized in the area lying between a line drawn four miles south of the north line of the township and a line drawn one mile north of the south line of the township, that is to say, in the area constituting the tier of sections of which 26 is one.

Having heard the testimony and having carefully re-read and re-examined all of the exhibits bearing on this question of survey, I am persuaded that the defendant Gulf's theory of survey is well founded in fact and in keeping with the fundamental principles of surveying. It is believed that the correctness of this conclusion can be demonstrated by the following comparison of plaintiffs' own exhibits. Having in mind the testimony of Blakemore and Lovell which was that the so-called Connelly oak is located one-half mile north of the south line of sections 3 and 4, and that their third mile post which was their point of beginning is located on the west bank of the old bed of Bayou Lafourche and that Connelly says that his third mile post where he began the survey of this township is located on the west bank of the old bed of Bayou Lafourche, reference will now be made to plaintiffs' exhibits Pittman 8 and Pittman 9. Pittman 8 is a transparent film showing the traverse of Bayou Lafourche

according to the field notes of intervenor Shell. Pittman 9 is a map which was prepared to portray the Connelly field notes of the township in question. By superimposing Pittman 8 on top of Pittman 9 so that the so-called Connelly oak is one-half mile north of the south line of Sections 3 and 4 and 'the third mile post is on the west bank of the old bed of Bayou Lafourche, it will be observed that beginning at the third mile post and proceeding south in accordance with Connelly's courses and distances, every corner which Connelly connects with Bayou Lafourche will be found to fall where Connelly said it fell for a distance of four miles south of that north line. Below this point it will be observed that the present bayou not only leaves Connelly's traverse, but that the corner common to Sections 26, 27, 34 and 35, if one follows Connelly's courses and distances, will not fall on the west bank of the bayou where Connelly said it fell, but will fall over 1000 feet east of the east bank of the present bayou. If then we accept the north line of the township as fixed by Blakemore and Lovell as the location of the north line as fixed by Connelly, and this results in every corner for four miles south of the north line falling relative to the bayou where Connelly said these corners fell, there is certainly every reason to conclude that Blakemore and Lovell have correctly located the north line. This comparison also shows that the error which Connelly committed, was committed south of an east and west line located four miles south of the north line of the township, and that defendants' engineers are correct in locating their south line of Section 23 four miles south of their north line of the township. A further comparison of plaintiffs' exhibits Pittman 8 and Pittman 9, will show that Connelly committed no error for the distance of one mile north of the south line of the township. In this connection it must be borne in mind that exhibit Pittman 8 indicates the present location of the two banks of Bayou Lafourche, whereas Connelly's traverses of the bayou are farther apart than the banks of the present bayou. With this observation in mind, let Pittman 8 be placed on top of Pittman 9 so that the south line of the township, as shown on Pittman 8, will be over the south line of the township, as shown on Pittman 9. This comparison will show that if one begins at the south line of the township and reverses Connelly's calls as he came down the bayou,

and follows his calls as he went up the bayou, the present bayou will fall within Connelly's two traverses and the cornei common to Sections 26, 27, 34 and 35, which he says is located on the right bank of the bayou, will fall on Connelly's west traverse of the bayou. It will also show that from that corner no other corner throughout the township will fall, relative to the bayou, as Connelly says it fell. Thus it appears from plaintiffs' own exhibits that Connelly's error is localized between an east and west line lying one mile north of the south line of the township.

In the light of the conclusions reached on this question of survey, it follows that plaintiffs have not carried the burden of proof as to the identification between the land involved in this litigation as located and described on the ground and the lots and sections claimed to be owned by plaintiffs under their record title. This statement, however, is subject to qualification in view of the admission of defendant Gulf that the Bernard lands include the whole of lot 7 of Section 23 (except the Doucet lands) and 290 feet of lot 1 of Section 26. And as there is proof in the record to justify this admission, it follows that the acceptance of the Gulf's theory of survey does not put an end to the controversy, but that there still remains open for decision all the title issues of this case as to the southern or lower portion of the land in suit. However, before entering the further discussion it might be well to add the observation that these questions of survey become relatively unimportant if this record supports the conclusion that the deed of April 2, 1881 is valid and includes lot 7 of Section 23 and lots 1, 4 and 5 of Section 26, and it is thereupon held that said lots were validly forfeited to the State of Louisiana for the non-payment of taxes, and were sold by the state to Millien Bernard by said mentioned deed of April 2, 1881.

The defendant Gulf contends that the State of Louisiana acquired the tract of land which embraces lot 7 of Section 23 and lots 1, 4 and 5 of Section 26 by one or more forfeitures for the delinquent taxes for the years 1872 to 1876, inclusive, and that the tax collector's deed executed in favor of Millien Bernard on April 2, 1881 was predicated on the prior forfeiture or forfeitures of the lands covered by the tax sale. The description in that deed reads: "A certain tract of swamp land lying on the south or left bank of Bayou Lafourche and bounded by the lands of Bernard & Sanders, said tract measuring about 2250 acres."

The items on the assessment rolls on which defendants rely are set forth in the original answer of defendant Gulf. These items are described as Number 1063 on the rolls of 1872, Number 1088 on the rolls of 1873, Number 1075 on the rolls of 1874, Number 1109 on the rolls of 1875, and Number 1115 on the rolls of 1876. An examination of the tax rolls for the year 1872-1876, both inclusive, reveals that the assessor in setting up his assessments on the rolls first set up the lands fronting on the west or right bank of Bayou Lafourche and then came over to the east bank of Bayou Lafourche and set up his assessments going up the bayou. The assessments upon which defendants rely constitute in each instance the second tract listed by the assessor as he went up the bayou. This second tract was assessed for the years 1872, 1873 and 1874 to Pierre Thibodeaux, and for the year 1875 to P. A. Thibodeaux, and for the years 1876, 1877, 1878 and 1879 against "owners unknown," and for the year 1880 against "unknown owners," but it is clear from the assessment rolls that each of those various assessments covers the same tract of land, that is to say, the tract bounded below by Dhue and above by Sanders. In this connection it will be remembered that the deed of April 2, 1881, gives the lower and upper boundaries respectively as Bernard and Sanders. However, this is without significance and there can be no doubt that the reason for the change in description from Dhue and Sanders is attributable to the fact that Millien Bernard acquired by tax deed dated December 6, 1877, the land which formerly belonged to Wilfred Dhue. In the recent case of Egle et al. v. Constantin et al., 198 La. 899, 5 So.2d 281, decided November 3, 1941, the Supreme Court of Louisiana, in upholding the validity of the aforementioned tax deed dated December 6, 1877, held that by that deed Millien Bernard acquired the continuous strip of land there referred to, including lot 1 of Section 3, T. 22 S., R. 22 E., which is the most northerly of all the lots comprising said strip of land. It is, therefore, clear that the land described in the deed of April 2, 1881, was bounded on the west by Bayou Lafourche, on the north by lands belonging to Sanders, and on the south by lot 1 of Section 3, T. 22 S., R. 22 E., which

was part of the lands then belonging to Bernard. The fourth boundary is shown by the evidence to be an irregular line that adjoins lands which at that time were owned by the State of Louisiana. It is also clear from the official township plat that the three boundaries mentioned in the deed of April 2, 1881, cannot be three of the boundaries of any other continuous tract of land fronting on Bayou Lafourche other than the continuous tract of land that is made up of lot 7 of Section 23 and lots 1, 4, 5 and 7 of Section 26, the NW¼ of NW¼ of Section 35, and lots 3, 4 and 7 of Section 34, T. 21 S., R. 22 E.

Lovell testified that as a surveyor, he would have no difficulty in locating the lands covered by and described in the deed dated April 2, 1881, and that he would fix the boundaries thereof as defendants contend they should be fixed. Furthermore, the evidence in this case shows that Millien Bernard had no difficulty in identifying the property covered by the deed of April 2, 1881; that he immediately went into possession and held same until his death, and his successors in title have held possession since that time and have paid the taxes as owners for more than fifty years. It is, therefore, my fixed opinion that the description of the property as set forth in the tax deed of April 2, 1881, coupled with the extrinsic evidence in this case is such to enable the court to determine with certainty the property covered by said deed. Close v. Rowan, 171 La. 263, 130 So. 350; Pierson v. Castell Land & Harbor Co., 159 La. 158, 105 So. 274; Gouaux v. Beaullieu, 123 La. 684, 49 So. 285.

■ Plaintiffs contend that item 1074 on the assessment rolls of 1872 was an assessment of the J. B. Pittman property and that this and subsequent similar assessments embraced and included the lands which are claimed to be covered by the deed of April 2, 1881. That item and similar items on subsequent rolls read:

No. of Acres

"Pittman, J. B.  600  Bounded by Thibodeaux and Thibodeaux"

The evidence in this case shows that at the time of the first appearance of the 600 acre assessment on the assessment rolls and at the time when item 1074 was placed on the assessment rolls of 1872, J. B. Pittman claimed to own, exclusive of Oak Grove Plantation and adjoining lands in the rear, not only the 610.06 acres referred to in article 46 of the pretrial order, but also the 50.50 acres referred to in paragraph one of article 48, and the undivided one-half interest in the 158.78 acres referred to in paragraph two of article 48. Though these are the undoubted facts and though the assessment rolls show that the property assessed by that item fronts on the east bank of Bayou Lafourche and is bounded above and below by Thibodeaux, it is nevertheless contended that because the acreage is given as 600 it should be held that this and similar subsequent assessments covered the nine separate, distinct and non-contiguous tracts of land listed in article 46 as having a total of 610.06 acres. In support of this contention it is urged that the mere fact that the assessor made an error in his assessment, an error which they restrict to 10.06 acres, that this did not make J. B. Pittman's payment of taxes less efficacious as a payment of taxes on the land owned by him, and that under the uniform jurisprudence of Louisiana there can be no doubt that J. B. Pittman paid taxes on the property in controversy, together with any other property owned by him for each and every year from 1873 to 1934, inclusive. The court does not agree with plaintiffs. I find no decision, and none has been cited which hold either in principle, by analogy or reasoning that an assessment of a particular tract by metes and bounds would constitute the assessment of numerous separate and distinct tracts of land several miles apart fronting on different sides of a bayou, merely because the acreage given on those rolls approximates the total acreage claimed by the party against whom the assessment is made.

■ Assuming, however, for the purposes of discussion only, that plaintiffs are right and that the court should find that item 1074 on the 1872 rolls includes lot 7 of section 23, lots 1, 4, 5 and 7 of section 26, the NW¼ of NW¼ of section 35, and lots 3, 4 and 7 of section 34, T. 21 S., R. 22 E., plaintiffs would derive no benefit from such a holding, because the evidence in this case shows that J. B. Pittman did not pay the taxes for the year 1872 and whatever rights plaintiffs had in the property were forfeited to the State of Louisiana for the non-payment of taxes for that year. The evidence relative to the forfeiture shows that item 1074 was placed on the delinquent tax list for the year 1872 and that the list showing the unpaid taxes was

filed in the office of the parish recorder and in the office of the auditor of public accounts of the State of Louisiana. Thus every formality prescribed by Act No. 42 of 1871 was fully complied with. Section 68 of Act No. 42 of 1871 provides that the title to the property shall be vested in the state from the date of the filing of the delinquent lists in the auditor's office and further declares that the title so vested in the state shall be impeachable only on proof that the taxes, for the non-payment whereof the lands were returned forfeited, had been in fact paid to the tax collector before the return of the lists to the parish recorder. It is true that the proof in this case does not show the exact date on which the delinquent list of 1872 was filed in the office of the state auditor. However, the evidence adduced does show that the delinquent lists for the years 1872-1876, inclusive, were in the year 1920 turned over to the register of the state land office by the auditor in accordance with the opinion and direction of the attorney general, and that these lists had every appearance of having been filed in the auditor's office at the time required by law. The presumption of regularity which attaches to the acts of public officials is applicable to the facts of this case and the maxim "omnia praesumuntur rite" applies. In concluding the discussion on this branch of the case, it is sufficient to say that if plaintiffs are right in their contention that item 1074 on the 1872 rolls covers the property involved in this suit, then it follows that whatever title the plaintiffs had to said lots and quarter quarter section was divested by the forfeiture to the state and became vested in Millien Bernard by the deed of April 2, 1881, which covers and includes this property, and plaintiffs under Code of Practice, Article 15, have no interest to question the title under which the defendants own. Surget et al. v. Newman, 42 La.Ann. 777, 7 So. 731; Id., 43 La.Ann. 873, 9 So. 561; Rovens v. McRobinson, 117 La. 731, 42 So. 251; Griffing et al. v. Taft, 151 La. 442, 91 So. 832.

The evidence in this case shows that the same procedure, as outlined in the previous paragraph, was followed with reference to other property on the delinquent list of 1872, and with reference to the other property shown on the other delinquent lists heretofore mentioned. Consequently, I reach the conclusion that the other property was also forfeited to the state for the non-payment of taxes.

■ It would now appear in order to consider whether or not the defendants other than Victoria M. Guidry et al. are correct in their contention that the deed to Millien Bernard was a sale made by the state pursuant to Act No. 107 of 1880 of property theretofore forfeited to the state for taxes. The ordinance for the relief of delinquent taxpayers which forms part of the Constitution of 1879 provides that, if property theretofore adjudicated to the state for the non-payment of taxes is not redeemed as authorized in said ordinance, such property shall be then sold in the manner to be prescribed by law, and the title of the purchaser shall be full and complete. In compliance with this constitutional mandate, the Legislature of Louisiana in the year 1880 enacted Act No. 107, thereby prescribing the manner in which such property shall be sold and the procedure that shall be followed in the sale of property theretofore forfeited to the state for the non-payment of taxes. This act relates exclusively to the sale of property that had been theretofore forfeited to the state for the non-payment of taxes. In the deed to Millien Bernard dated April 2, 1881, the sheriff specifically declared in part that he was proceeding "by virtue of the power in me vested by law and in accordance with Section 2 of Act 107 entitled, 'An Act to provide for the sale of all property forfeited or sold to the state for delinquent taxes or licenses,' approved April 10, 1880, and having made the necessary publications and advertisement in the Thibodaux Sentinel, a newspaper published in the Parish of Lafourche, said publication having been made on the 19th of Jany. 1881 and having complied with all the formalities required by and specified in the act aforesaid, did expose at public auction, on the 5th day of March, 1881 * * * a certain tract of swamp land lying and situated on the left bank of Bayou Lafourche, and bounded by lands of Bernard & Sanders, said tract measuring about 2250 acres. The same having been seized for the payment of taxes due by owners unknown, as owners thereof, according to the tableau and assessment rolls of 1880." The date of sale as set forth by the sheriff in that deed and in the advertisements of said sale is the identical date prescribed in said act for the sale of property theretofore forfeited to the state for the non-payment of taxes. Copies of these advertisements as published in the Thibodaux Sentinel, a

newspaper published in the Parish of Lafourche, are in evidence, and so far as pertinent read as follows:

"Tax Collector's Sale

"State of Louisiana, Parish of Lafourche.

"By virtue of the authority vested in me by law I will proceed to sell at public auction at the court house door of this Parish, within legal sale hours, on Saturday, the 2nd day of April, 1881, in accordance with Section 1 of Act No. 107 of the General Assembly of this State Session of 1880, the following described property forfeited and sold for delinquent taxes and not redeemed, to-wit:

\* \* \*

"Owners unknown, 2250 acres land, left bank of Bayou Lafourche bounded by Bernard and Sanders taxes from 1874 to 1880.

\* \* \*

"Terms of sale.—The above described property having been once advertised and offered for sale in accordance with law and having failed to sell for the sum necessary to pay the amount due for taxes costs &c. it shall at this second offering be sold for what it will bring in cash, without limit, and the title be made to the purchaser as provided in Sec. 2 of said Act.

"Theophile Thibodaux,
"Sheriff and Ex-Officio Tax Collector, Lafourche."

Because in the advertisement the words, "taxes from 1874 to 1880" appear, and because in the deed of April 2, 1881, appear the words, "The same having been seized for the payment of taxes due by owners unknown, as owner thereof, according to the tableau and assessment rolls of 1880," plaintiffs urge that the court should disregard all of the other provisions of the advertisements and deed, and conclude that the sheriff was proceeding under Act No. 107 of 1880 to sell property for the taxes of 1880. I do not agree with plaintiffs that the recited facts support the conclusion that the sheriff was proceeding under Act No. 107 of 1880, an inapplicable statute, to sell property for unpaid and delinquent taxes. On the contrary, I am persuaded that the sheriff intended to and did proceed under Act No. 107 of 1880, the applicable statute, to sell property theretofore forfeited to the state for the non-payment of taxes and not redeemed; property which the evidence in this case shows had been forfeited to the state for the non-payment of taxes. This

view is seemingly supported by the following authorities: Surget et al. v. Newman, supra; Egle et al. v. Constantin et al., supra.

There can be no doubt that whatever title the state acquired through the forfeitures hereinabove referred to passed to Millien Bernard, although not expressly mentioned in the deed of the state, as a vendor cannot set up against his vendee any title which he had at the time of the sale. Wall v. Rabito, 138 La. 609, 70 So. 531; Egle et al. v. Constantin et al., supra. And as before mentioned, plaintiffs are without interest and cannot be heard to impeach the tax sale made to Millien Bernard.

Plaintiffs contend, in the alternative, that the assessments on which the forfeiture was made for the year 1872 constitute dual assessments and that the taxes were paid by plaintiffs on the property in controversy for each of the years following the year 1872 up to and including the year 1934. Considering the admission that the taxes due under item 1074 were never paid and the fact that the property covered by this assessment was adjudicated to the state on account of the non-payment of taxes and had never been redeemed, and the circumstance that no suit was brought within the period prescribed by section 11 of article 10 of the Constitution of 1921 to set aside the tax sale to Millien Bernard, it is clear from the plain provisions of this Constitutional article that plaintiffs can derive no benefit from a dual assessment, even if it existed.

Section 11 of article 10 of the Constitution of 1921 provides that: "No sale of property for taxes shall be set aside for any cause, except on proof of payment of the taxes for which the property was sold prior to the date of the sale, unless the proceeding to annul is instituted \* \* \* within three years from the date of the recordation of the tax deed \* \* \*." Like provisions are to be found in article 233 of the Constitutions of 1898 and 1913, the only material difference being that, in the earlier Constitutions, dual assessment was included as an additional ground of attack.

These constitutional provisions apply to the forfeiture of property to the state for the non-payment of taxes which accrued prior to the adoption of the Constitution of 1879. Quaker Realty Co. v.

Citizens' Bank of Louisiana, 131 La. 845, 60 So. 367; Griffing v. Taft, supra; Egle et al. v. Constantin et al., supra.

Having heretofore reached the conclusion that the description in the deed of April 2, 1881, and the admissible extrinsic evidence identifies the property in controversy, and that said deed was a sale of previously forfeited property, it follows that if there are any defects in the deed or in the forfeitures to the state, and there are none, they have been cured by the three year constitutional prescription pleaded by defendants other than Victoria M. Guidry et al.

In any event, and regardless of whether or not the three year constitutional prescription applies to sales made pursuant to Act No. 107 of 1880, it is believed that the title which plaintiffs had to lot 7 of Section 23, and lots 1, 4 and 5 of Section 26, T. 21 S., R. 22 E., was divested by the forfeiture of said lands to the state and became vested in Millien Bernard by the deed of April 2, 1881 and the accrual of the ten years prescription. It is a settled rule of law in this state that a bona fide purchaser at a tax sale, receiving a deed prima facie valid, though in fact invalid, after having actual and notorious possession of the property, in good faith, for ten years, acquires an indefeasable title by prescription acquirendi causa. Snelling v. Adair, 196 La. 624, 199 So. 782; Articles 3478-3498 Revised Civil Code of Louisiana.

Millien Bernard acted in good faith in purchasing under the sheriff's deed dated April 2, 1881, and he had a right to regard himself as a legal vendee when the property was not redeemed within the permitted time allowed by law. The evidence shows that he went into actual possession of the property, as owner, residing thereon and making such use thereof as conformed with its nature and his desires and needs. His possession was continuous and uninterrupted, peaceable, public and unequivocal, and he held and exercised such possession, as owner, up to the time of his death in the year 1900, and his widow and heirs thereafter maintained said possession at least up to the date of the sale to Eugene Constantin in the year 1905. The evidence further shows that there was a boundary fence above, and that he built fences in the lower part of his property, and that he was recognized in the community as in possession, as owner, of the property. That he intended to possess and did possess, as owner, is further evidenced by his general attitude towards the lands described in the deed. He used the land for the purpose for which it was suitable, that is, the grazing of cattle; he paid taxes on the property; sold part thereof to Beauregard Vizier by deed dated June 7, 1894; sold another part to Armant Crosby by deed dated May 18, 1895, and another part to Frank Griffin by deed dated August 10, 1895, and those parties went into possession of the land purchased, and thereafter exercised all rights of ownership thereof. This record thus supports the conclusion that Millien Bernard's title became perfect, and that any and all titles previous to the deed of April 2, 1881, were rendered null and void by the prescription of ten years long prior to any claimed action by J. B. Pittman, or by any one claiming by, under, or through him.

In view of the conclusions reached in this case, the other pleas of prescription filed by the defendants other than Victoria M. Guidry et al. need not be discussed.

From the foregoing it is plain that the title of John B. Pittman was divested and a new title created in Millien Bernard. There remains for consideration the question as to whether or not a new title was thereafter created in plaintiffs.

It is not claimed that plaintiffs acquired any title subsequent to the date that the deed of April 2, 1881, became fully protected by the prescription of ten years. Plaintiffs' contention that they have a good ten year prescriptive title to the property involved herein is based upon that unsatisfactory evidence which tends to show that J. B. Pittman exercised actual physical possession of the property involved in this litigation by leasing portions of it during the year 1910 to persons who actually resided on said property, and on the assumption that there is no satisfactory evidence that any one possessed any portion of the property as owner openly and adversely to J. B. Pittman after the year 1910 and until the year 1931, when Louis Bernard returned to and took possession of the property. The evidence upon which plaintiffs principally rely consists of some old papers belonging presumably to the nephew of the elder J. B. Pittman, which were found among his papers and effects. These documents were admitted in evidence under the ancient document rule and have but little

probative value because there is no evidence to show that the parties whose signatures are purported to be affixed to these documents knew or understood their contents, and it is known that most, if not all, of the purported signers could not read or write, and it is not shown that the documents were read to them. Furthermore, at least one of the documents is shown to have been signed by a party who never lived on the lands in controversy, and who, as a matter of fact, lived several miles away. To hold that these ancient documents can be regarded as creating a new title in plaintiffs is unthinkable. The plea is without merit.

For the reasons above stated the Court concludes that plaintiffs, intervenors and defendants Victoria M. Guidry et al. are not entitled to the judgment for which they pray, and that plaintiffs' suit, the petitions of intervention, and the demands of Victoria M. Guidry et al. against the other defendants should be dismissed at their costs.

Findings of fact and conclusions of law as provided by the rule, conforming to the foregoing views, will be signed by the Court and filed herein.